## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No.: 14-20200-CIV-BLOOM/VALLE

PEARSON EDUCATION, INC.,
ELSEVIER, INC.,
CENGAGE LEARNING, INC.,
JOHN WILEY & SONS, INC., and
MCGRAW-HILL GLOBAL EDUCATION
HOLDINGS, LLC,

    Plaintiffs and Counter-Claim Defendants,

v.

HOTFILE CORP. and
ANTON TITOV,

    Defendants and Counter-Claim Plaintiffs.

### ANTON TITOV'S OPPOSITION TO MOTION TO DISMISS COUNTERCLAIMS

## *"The lady doth protest too much, methinks."*

Hamlet Act 3, scene 2, 222–230

### Introduction

In their Motion to Dismiss, Plaintiffs make two arguments as to why this Court should dismiss Mr. Titov's counterclaims: (1) that the first counterclaim (for declaratory judgment) fails to state a claim because Plaintiffs are (supposedly) willing to concede the issue in controversy, and (2) the counterclaims are, allegedly, duplicative of Mr. Titov's affirmative defenses and will, therefore, have to be decided in any event.

With respect to the first argument, Plaintiffs have indeed played the role of Hamlet well. Although they now assert in their Motion that their Complaint was specifically drafted to avoid the controversy addressed in the first counterclaim, their actual Complaint claims that they are

1

being injured by Hotfile's alleged actions to this day, necessitating immediate injunctive relief. Additionally, Plaintiffs have previously asserted to this Court – both in their written submissions and in open court – that Hotfile could be held liable for infringements and/or damages even after they became unarguably DMCA compliant.  Indeed, even the present motion is far from unequivocal in its position (at least concerning damages).  Although there are certainly ways in which the Plaintiffs *might* render the first count of the counterclaims moot (actual admissions, stipulations, or the like), their failure to do so, to date at least, is fatal to their Motion to Dismiss.

Plaintiffs' second argument – that they will be horribly prejudiced and burdened by unnecessary discovery if the Court allows the Counterclaims to proceed – makes little sense in light of their position that the counterclaims are merely duplicative of Mr. Titov's affirmative defenses.

Because Mr. Titov's Counterclaims state legitimate claims which are inexorably tied to the Plaintiffs' claims in this case, Plaintiffs' Motion should be denied.  In further support of this Opposition, Mr. Titov states as follows.

## Facts

Despite this being a Motion to Dismiss the Counterclaims,[1] Plaintiffs seem to be confused about which facts the Court is to consider, choosing to provide the Court with the facts as alleged in their Complaint, as opposed to the facts as alleged in the Counterclaims.  For the purposes of the Plaintiffs' Motion, the relevant facts as alleged in the Counterclaim, which the Court must accept as true, are as follows:

---

[1] Plaintiffs leave it to the Court and Mr. Titov to guess as to which subsection of Rule 12(b) their motion is premised upon.  Presumably, Plaintiffs found it irksome to have to identify a relevant subsections given that their motion doesn't actually fall within any relevant subsection (Plaintiffs seem to understand that Mr. Titov's counterclaims state a claim upon which relief may be granted).  Instead, Plaintiffs seem to rely on a more generalized hope that the Court will use its discretion to dismiss the counterclaims without ever considering whether Mr. Titov states a valid cause of action.

From 2009 through 2013, Hotfile Corp. ("Hotfile") operated a website at hotfile.com. Counterclaims, ¶ 1.  During that time, Hotfile was popular in the field of Internet file-hosting. *Id.*, ¶ 2.  It hosted over 90 million digital files for businesses and people around the world in its high-speed, high-capacity data center.  *Id.*  Those files included video, audio, software, and virtually every other file type that its users chose to upload, either for their own personal use, for cloud storage, or to share with their friends, family, colleagues, or coworkers.  *Id.*, ¶ 3.

When a user first signed up with Hotfile or uploaded a file he first had to agree to Hotfile's Terms of Service and its Intellectual Property Policy which prohibited copyright infringement.  *Id.*, ¶ 4.  Upon uploading a file, the individual received a private URL link that was known only to that user.  *Id.*, ¶ 5.  The user could keep that link private for his own personal cloud storage (making the location of the file near-impossible to find) or it could share the link with other persons whom the user had authorized to access their files.  *Id.*  Hotfile did not index the files stored at the site, nor did it provide a search function for users to locate such files.  *Id.*

Hotfile did not, in the ordinary course of its business, review the millions of files that its users uploaded to the site.  *Id.*, ¶ 6.  One of the few ways that Hotfile might learn of the content of a file uploaded by a user was if it received a DMCA takedown notice from a purported rights-holder, asserting that the file contained infringing materials.  *Id.*, ¶ 7.  Even in such instances, however, Hotfile would not know – based solely on the takedown notice – whether the file in question was actually infringing or not.  *Id.*  Not infrequently, the uploader of a file would file a counter-notice under the DMCA, asserting a legitimate right to upload the file in question.  *Id.* Plaintiffs in this action did not serve Hotfile with any takedown notices at any time concerning any of the works in suit.  *Id.*, ¶ 8.

When it was operational, Hotfile's revenues came solely from "premium" subscriptions, whereby users paid up to $9 per month for faster downloads, permanent file storage, and other benefits.  *Id.*, ¶ 9.  This fixed fee did not vary based on what or how much the premium user was using the service.  *Id.*  For the same amount, premium users could be using Hotfile for personal cloud storage, downloading open source software, or any other storage use.  *Id.*  As such, Hotfile did not derive any direct benefit from allegedly infringing activity.  *Id.*

From its inception, Hotfile had in place policies, practices, and safeguards to discourage the use of its service in ways that would infringe on the rights of copyright holders, including expressly prohibiting infringement in its Terms of Service, implementing a rigorous notice-and-takedown regime, implementing "take down, stay down" technology based on digital fingerprinting and strengthening its repeat copyright infringer termination policy over time.  *Id.*, ¶¶ 10-12.  *See also, Id.*, ¶ 19 (describing MD-5 fingerprinting technology); ¶ 20 (describing strengthened repeat infringer policy); ¶¶ 18-19 (describing implementation of Special Rightsholders Accounts, which allowed content owners to directly remove infringing files without the need to submit requests to Hotfile).  The Plaintiffs did not take advantage of any of these policies, practices or safeguards.

The first version of Hotfile's website had a "report abuse" form for providing notice of suspected infringing links.  *Id.*, ¶ 13.  Users would input an allegedly infringing URL into this form, which generated a message to Hotfile's abuse department.  *Id.*  In response Hotfile took down the links.  None of the Plaintiffs ever utilized this tool on the Hotfile website.  *Id.*  In April of 2009, Hotfile went above and beyond its legal obligations and provided high volume content owners the ability to direct take down infringing files through Special Rightsholders Accounts.  *Id.*, ¶¶ 18-19.

4

In April 2009, within months of its launch, Hotfile identified on its website a designated agent for DMCA notices, permitting parties to send notices to the abuse@hotfile.com email address. *Id.*, ¶¶ 14-15. In December 2009, Hotfile registered Constantin Luchian as its designated DMCA agent and provided the abuse@hotfile.com address to the Copyright Office. *Id.*, ¶ 16. In April or May of 2010, Hotfile posted Mr. Luchian's name to the Hotfile website. *Id.* Content owners (other than the Plaintiffs) consistently utilized Hotfile's notice-and-takedown processes and Hotfile expeditiously responded to takedown notices. *Id.*, ¶ 17. In general, Hotfile took down files within 48 hours of receiving a DMCA takedown notice. *Id.*

By February 18, 2011, at the latest, Hotfile was fully compliant with all of the prerequisites to qualify it for safe harbor immunity under the DMCA. *Id.*, ¶ 21. From February 18, 2011 through the time that it ceased operations, Hotfile continued to implement ever-stronger protections against the upload of infringing materials.

In February of 2011, five movie studios, Disney Enterprises, Inc., Twentieth Century Fox Film Corporation, Universal City Studios Productions LLLP, Columbia Pictures Industries, Inc., and Warner Brothers Entertainment, Inc. (collectively, the "Disney Plaintiffs") brought an action in this Court against Hotfile Corporation and Mr. Titov (the "Disney Litigation"). *Id.*, ¶ 23. In October of 2011, the Disney Plaintiffs first disclosed that they had retained Attorney Scott Zebrak to serve as an expert witness in the Disney Litigation. *Id.*, ¶ 24. Attorney Zebrak was retained by the Disney Plaintiffs to serve as an expert witness well before October of 2011. *Id.* Attorney Zebrak is a founding partner of the law firm Oppenheim & Zebrak, counsel for the Plaintiffs in the present case. *Id.*, ¶ 26. Attorneys Zebrak, Oppenheim, and Mustico have represented one or more of the Plaintiffs named in the present action since at least 1998. *Id.*, ¶ 27. Attorney Oppenheim has frequently represented Disney and/or other of the Disney Plaintiffs

and has frequently served as co-counsel in such actions with the counsel for the Disney Plaintiffs in the Disney Action.  *Id.*, ¶ 28.

By 2009, each of the Plaintiffs was well aware of the existence of the Hotfile.com website and many similar cyberlockers and were further aware that some users of those sites were uploading to those site copies of their works, which the Plaintiffs claim to have been unauthorized.  *Id.*, ¶¶ 29-30.  For example, in May of 2009, the *New York Times* reported that Plaintiff John Wiley & Sons, Inc. had three full time employees who did nothing but search the internet (including cyberlockers) for infringing copies of their works.  *Id.*, ¶ 30.  According to John Wiley & Sons' general counsel, who was quoted in that article, the publisher was sending five times the number of takedown notices in 2009 than it had the year before.  *Id.*

By 2009, concerns that unauthorized copies of books might be improperly shared by the users of cyberlockers was well publicized in the mainstream media, within the publishing industry and between the Plaintiffs.  *Id.*, ¶¶ 31-32, 35-36.  Additionally, by the end of 2009 a widely-cited report by Attributor, a company which provided services to rightsholders to help them identify unauthorized copies of their works on the internet discussed in detail the problems of electronic books being uploaded to cyberlockers, including Hotfile.  *Id.*, ¶ 32.  At least one of the Plaintiffs, John Wiley & Sons, was a subscriber to Attributor's services.  *Id.*  By 2009, each of the Plaintiffs had employees, contractors, or agents whose job duties included searching the internet to locate allegedly infringing copies of their works.  *Id.*, ¶ 33.  According to the Plaintiffs' own complaint, it was not at all difficult for the Plaintiffs to identify allegedly infringing materials that had been uploaded to the Hotfile.com website by Hotfile's users, including the works owned by the Plaintiffs themselves.  *Id.*, ¶ 34.  Indeed, according to the Plaintiffs, "anyone who wanted to find a popular book such as *Windows for Dummies* on Hotfile

would simply have to type that title and Hotfile into an Internet search engine such as Google." *Id.*, ¶ 34.

Each of the Plaintiffs is an active member of the trade association, the Association of American Publishers (the "APA").  *Id.*, ¶ 35.  The "APA" and its members have long claimed that the users of cyberlockers were misusing those services to upload and share allegedly infringing materials.  *Id.*, ¶ 36.  For example, in 2010, the AAP, on behalf of its members, presented the Department of Commerce with a 21 page report (citing extensively to the Attributor report), detailing their belief that infringement was rampant across cyberlockers.  *Id.*

<u>**Argument**</u>

### I.    An Actual Controversy Exists Concerning Hotfile's Entitlement to DMCA Safe Harbor Immunity as of February 18, 2011.

Plaintiffs claim in their Motion to Dismiss that no actual controversy exists with respect to Hotfile's entitlement to DMCA safe harbor immunity as of February 18, 2011 because (according to Plaintiffs), their complaint was narrowly drafted to limit their claims to infringements occurring prior to February 18, 2011.  Not only is Plaintiffs' complaint *not* so limited, but Plaintiffs new assertion (that they make no claims concerning liability or damages post-February 18, 2011) is in direct contradiction to Plaintiffs' prior assertions.

In their Complaint, Plaintiffs allege, *inter alia*, that "unless enjoined, Defendants' conduct will continue to cause Plaintiffs irreparable injury for which they have no adequate remedy at law."  Complaint, ¶ 48.  Plaintiffs seek, among other remedies, both a permanent injunction and damages measured by Defendants' profits (without limitation).  *Id.*, Prayers for Relief, ¶¶ A-B.  On its face, then, the Plaintiffs' complaint both claims infringement and damages post-February 18, 2011 and an actual controversy clearly exists.

Plaintiffs continued advocating this position in their Opposition to Mr. Titov's Motion to

Dismiss:

> Titov points to no authority to support the argument that conduct that predated the statute of limitations but results in infringement within the statutory period is insulated from liability.   Indeed, the statutory limitation does not look at the totality of the conduct, but rather when the claim accrues.   In this case, the infringement claims accrued within the three-year statutory period. . . .   His argument also fails on the other side of the timeline because Titov has not established that Hotfile is entitled to the benefit of a DMCA safe harbor as of February 8, 2011.

Docket No. 29, Page 11, Footnote 6.

And, finally, Plaintiffs specifically argued in open court that Hotfile *could* be liable for

infringements or damages even after becoming unarguably DMCA compliant:

> [S]o there were hundreds of millions, billions of files on Hotfile, infringing files being distributed to people around the world, including in Florida.  What they are saying is: Okay.   At some point in time after February 8th of 2011, they implemented a repeat infringer policy.  Okay.  Those billions of files are still on the servers.  Those billions of files are still being downloaded.  The publisher's rights are still being infringed.

Motion to Dismiss Hearing, October 23, 2014, Transcript, p. 17 (attached hereto as Exhibit 1).

In their Complaint, their Motion to Dismiss, and in open court, then, Plaintiffs have

argued that the Defendants can be liable for alleged infringement and/or damages allegedly

incurred by the Plaintiffs both before and after February 18, 2011.  It is only in their present

Motion that Plaintiffs have claimed otherwise.

If the Plaintiffs truly wanted to render Count I of the Counterclaims moot, they could

answer the Counterclaims, admitting the points which the Defendants claim to be in controversy,

thereby eliminating the issue.  Or they could enter into a comprehensive stipulation as to liability

and damages post-February 18, 2011.  They have done neither.  Instead, they have sought to play

both sides of the issue – claiming in their motion that no controversy exists, while consistently

asserting otherwise in their written and oral submissions to the Court.  Eventually, like Hamlet, the Plaintiffs will need to commit to one position or the other.  Until they do, however, their Motion to Dismiss must be denied.

### II.    The Counterclaims Should Not Be Dismissed as Duplicative

Plaintiffs also argue that this Court should decline to exercise jurisdiction over Mr. Titov's counterclaims, claiming that such claims will necessarily be decided, in any event, as a result of the allegations raised in Plaintiffs' Complaint and in Mr. Titov's affirmative defenses. As a preliminary matter, even if the Counterclaims *were* duplicative of Mr. Titov's affirmative defenses, this would not require dismissal.  "[T]he mere fact that a declaratory relief claim may be duplicative of an affirmative defense is not enough, in and of itself, to warrant the dismissal or striking of a pleading.  To be sure, mere redundancy is not grounds for dismissal under Rule 12(b)(6) for failure to state a claim. . . .  Nor does mere redundancy require the Court to strike a claim."  *Regions Bank v. Commonwealth Land Title Ins. Co.,* 2012 U.S. Dist. LEXIS 158984 (S.D. Fla. Nov. 5, 2012) (internal citations omitted).  *See also Medmarc Cas. Ins. Co. v. Pineiro & Byrd PLLC,* 783 F. Supp. 2d 1214, 1217 (S.D. Fla. 2011) ("Even if the counterclaim were wholly redundant, this Court may exercise its discretion by not dismissing the counterclaim."); *Astral Health & Beauty, Inc. v. Aloette of Mid-Mississippi, Inc.*, 895 F. Supp. 2d 1280, 1284 (N.D. Ga. 2012) ("Even if the counterclaim were wholly redundant, this Court may exercise its discretion by not dismissing the counterclaim."); 6 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure, § 1406, at 36 (2d ed. 1990) ("[T]he safer course for the court to follow is to deny a request to dismiss a counterclaim for declaratory relief unless there is no doubt that it will be rendered moot by the adjudication of the main action.").

Additionally, to the extent that the Counterclaims seek different relief or rely on different facts than those necessary for a determination of the issues in the Complaint, then the Counterclaims also serve a separate purposes from the Complaint and should not be dismissed. *Id.*  In the present case, the Plaintiffs' own attempts to distance themselves from the allegations of their complaint (while at the same time maintaining the option to rely on those allegations) gives the Counterclaims a separate and independent value.  For example, despite the wording of the Complaint (which seeks relief for alleged acts through the present day), Plaintiffs assert that their claims are limited to pre-February 2011 conduct.  The same holds true for Plaintiffs' claims for damages.  In this way, Plaintiffs seek to improperly hamstring the Defendants' ability to properly defend themselves and to have the Court rule on the applicability of DMCA safe harbor post-February 18, 2011.  Because the Plaintiffs take positions on both sides of this fence, the only way in which the Defendants can know for sure that they will be able to present the DMCA safe harbor issue to the Court is through the assertion of a counterclaim seeking a declaratory judgment, which is precisely the point of Count I of the Counterclaims.  Defendants' rights should not be dependent on the Plaintiffs' whims and ever-shifting positions.

The same arguments apply to Mr. Titov's other counterclaims.  The statute of limitations and laches questions are based on factual allegations which the Complaint either attempts to avoid entirely or on which the Plaintiffs have come down on both sides.  As such, the counterclaims add unique elements to the litigation.

Because the Counterclaims seek different relief and rely on different factual allegations than those necessary to decide the Plaintiffs' claims, the Counterclaims should not be dismissed.

### III.     Plaintiffs Will Suffer No Undue Prejudice As a Result of the Counterclaims.

Having first spent the first three-quarters of their brief arguing to the Court that the Counterclaims are nothing more than mirror images of Mr. Titov's affirmative defenses, Plaintiffs then do a complete about-face, asserting that, if the Court allows the Counterclaims to survive, it will change the entire complexion of the case and require extensive additional discovery.  Plaintiffs cannot have it both ways.  If the Counterclaims were really the mirror images of the affirmative defenses, they would not change the nature of the case or require any additional discovery.  *See, e.g., Regions Bank v. Commonwealth Land Title Ins. Co.*, 2012 U.S. Dist. LEXIS 158984 (S.D. Fla. Nov. 5, 2012) ("Moreover, if Count II of the Counterclaim really is just a mirror image of Commonwealth's sixth affirmative defense, the Court fails to see how Regions is left any worse off by Count II remaining in the case.  Either way, the issues underlying the affirmative defense and declaratory count will be the subject of discovery and adjudication."); *United States Bank Nat'l Ass'n v. Alliant Energy Res., Inc.,* 2009 U.S. Dist. LEXIS 54439 (W.D. Wis. June 26, 2009) ("If, as plaintiff argues, the counterclaims are truly repetitious, then plaintiff will not have to expend much time on any additional discovery or briefing.  However, dismissing a plausible claim erroneously could lead to a subsequent appeal, thereby delaying the eventual resolution of this case."); *VW, Credit, Inc. v. Friedman & Wexler, LLC,* 2010 U.S. Dist. LEXIS 57451 (N.D. Ill. June 7, 2010) ("[E]ven if the counterclaim turns out to be an exact mirror image of VW Credit's claim, which seems doubtful, the fact that the counterclaim remained . . . would not prejudice VW Credit in the slightest.").

On the other hand, to the extent that the Counterclaims are distinct from the Complaint and the affirmative defenses, the Defendants are entitled to take discovery appropriate to their valid claims.  Indeed, if the mere necessity of additional discovery were a reason to dismiss

counterclaims, no counterclaim could survive and every plaintiff could preclude the assertion of counterclaims simply by complaining that the counterclaims will require the parties to engage in additional discovery.[2]  Either way, the Plaintiffs' argument fails and their motion to dismiss should be denied.

<u>CONCLUSION</u>

For the reasons stated hereinabove, Plaintiffs' Motion to Dismiss Anton Titov's Counterclaims should be denied.

**Respectfully submitted:**

/s/ Valentin Gurvits
Valentin D. Gurvits (# 643572 - *pro hac vice*)
Matthew Shayefar (# 685927 - *pro hac vice*)
BOSTON LAW GROUP, PC
825 Beacon Street, Suite 20
Newton Centre, MA  02459
Telephone: (617) 928-1804
Facsimile: (617) 928-1802
vgurvits@bostonlawgroup.com
matt@bostonlawgroup.com

/s/ Brady J. Cobb
Brady J. Cobb, Esquire
Florida Bar No. 031018
COBB EDDY, PLLC
642 Northeast Third Avenue
Fort Lauderdale, Florida 33304
Telephone (954) 527-4111
Facsimile  (954) 900-5507
bcobb@cobbeddy.com

/s/ Evan Fray-Witzer
Evan Fray-Witzer (# 564349 - *pro hac vice*)
CIAMPA FRAY-WITZER, LLP
20 Park Plaza, Suite 505
Boston, MA 02116
Telephone: (617) 426-0000
Facsimile: (617) 507-8043
Evan@CFWLegal.com

*Attorneys for Mr. Titov*

Dated: January 5, 2015

---

[2] If all that is required to defeat a claim is the assertion that the claim will require the parties to engage in discovery that one side considers to be onerous, the Defendants would like to move to dismiss the Complaint in its entirety. Surely the Plaintiffs will seek discovery (indeed they already have), to which the Defendants would prefer not to have to respond.  The argument is frivolous on its face and recalls the old legal saw that "to state the argument is to refute it."

## CERTIFICATE OF SERVICE

**I hereby certify** that a true and correct copy of the foregoing was served electronically via the CM/ECF electronic filing system on all counsel or parties of record on the attached service list this 5th day of January, 2015.

/s/ Brady J. Cobb
Brady J. Cobb

## SERVICE LIST

Karen L. Stetson
GRAY-ROBINSON, P.A.
1221 Brickell Avenue, Suite 1600
Miami, Florida 33131
Telephone: 305-416-6880
Facsimile: 305-416-6887
karen.stetson@gray-robinson.com

Matthew J. Oppenheim
Kerry M. Mustico
OPPENHEIM + ZEBRAK, LLP
4400 Jenifer Street, NW, Suite 250
Washington, District of Columbia 20015
matt@oandzlaw.com
kerry@oandzlaw.com