UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.: 14-20200-CIV-BLOOM/VALLE

PEARSON EDUCATION, INC.,
ELSEVIER, INC.,
CENGAGE LEARNING, INC.,
JOHN WILEY & SONS, INC., and
MCGRAW-HILL GLOBAL EDUCATION
HOLDINGS, LLC,

   Plaintiffs,

v.

HOTFILE CORP. and
ANTON TITOV,

   Defendants.

## HOTFILE CORP'S AMENDED ANSWER TO COMPLAINT AND COUNTERCLAIMS

Defendant Hotfile Corp. ("Hotfile"), for its Amended Answer to the Complaint of Plaintiffs Pearson Education, Inc., Elsevier, Inc., Cengage Learning, Inc., John Wiley & Sons, Inc., and McGraw-Hill Global Education Holdings, LLC (collectively, the "Plaintiffs" or "Publishers") answers as follows:

### NATURE OF THE ACTION

1.    Hotfile is without sufficient information or knowledge to admit or deny the allegations of the first four sentences of this paragraph and therefore denies the same. Hotfile denies the allegations of the fifth sentence of this paragraph.

2.    Hotfile is without sufficient information or knowledge to admit or deny the allegations of this paragraph and therefore denies the same.

1

3. Hotfile is without sufficient information or knowledge to admit or deny the allegations of this paragraph and therefore denies the same.

4. Hotfile is without sufficient information or knowledge to admit or deny the allegations of this paragraph and therefore denies the same.

5. Hotfile is without sufficient information or knowledge to admit or deny the allegations of this paragraph and therefore denies the same.

6. Hotfile admits that it designed, created and maintained a business called Hotfile that provided online file storage services to its users (the "Hotfile Website"). Hotfile admits that allowed users to upload digital content to the Hotfile Website's servers and that, if the uploading user chose to share that content, the uploading user could enable other users to download that content. Hotfile denies the remaining allegations of this paragraph.

7. Hotfile is without sufficient information or knowledge to admit or deny the allegations of this paragraph and therefore denies the same.

8. Hotfile admits that the Court in *Disney Enterprises, Inc., et al v. Hotfile Corp., et al*, No. 1:11-cv-20427-CIV-KMW (S.D. Fla. Sept 20, 2013) issued a ruling regarding Hotfile. Hotfile states that the referenced ruling speaks for itself and no answer to the allegations contained in this paragraph is required. To the extent a response is deemed necessary, Hotfile denies the allegations of this paragraph. In answering further, Hotfile states that the referenced ruling applies only to Hotfile's alleged conduct prior to the filing of the complaint in that action on February 8, 2011.

9. Hotfile states that the referenced ruling speaks for itself and no answer to the allegations contained in this paragraph is required. To the extent a response is deemed necessary, Hotfile denies the allegations of this paragraph. In answering further, Hotfile states

that the referenced ruling applies only to Hotfile's alleged conduct prior to the filing of the complaint in that action on February 8, 2011.

10. This paragraph contains a conclusion of law for which no response is required. To the extent a response is deemed necessary, Hotfile denies the allegations of this paragraph.

## PARTIES

11. Hotfile is without sufficient information or knowledge to admit or deny the allegations of this paragraph and therefore denies the same.

12. Hotfile is without sufficient information or knowledge to admit or deny the allegations of this paragraph and therefore denies the same.

13. Hotfile is without sufficient information or knowledge to admit or deny the allegations of this paragraph and therefore denies the same.

14. Hotfile is without sufficient information or knowledge to admit or deny the allegations of this paragraph and therefore denies the same.

15. Hotfile is without sufficient information or knowledge to admit or deny the allegations of this paragraph and therefore denies the same.

16. Hotfile is without sufficient information or knowledge to admit or deny the allegations of this paragraph and therefore denies the same.

17. Hotfile is without sufficient information or knowledge to admit or deny the allegations of this paragraph and therefore denies the same.

18. Hotfile admits the allegations of this paragraph.

19. Hotfile admits that Defendant Anton Titov ("Titov") is a foreign national. Hotfile denies that Titov resides in Florida. Hotfile admits that Titov was involved in designing some of the software for the Hotfile Website, that he participated in designing some of the business

model of the Hotfile Website, that he was a principal of Hotfile Corp., and that he received compensation as a result of his engagement with Hotfile Corp.  Hotfile denies the remaining allegations of this paragraph.

## JURISDICTION AND VENUE

20.     Hotfile admits the allegations of this paragraph for jurisdictional purposes only and denies them in all other respects.

21.     Hotfile admits that Hotfile utilized Lemuria Communications for Internet hosting services.  Hotfile denies the remaining allegations of this paragraph.

22.     Hotfile denies the allegations of this paragraph.

23.     Hotfile admits the allegations of this paragraph for venue purposes only and denies them in all other respects.

## THE HOTFILE SYSTEM

24.     Hotfile admits the allegations in this paragraph.  In answering further, Hotfile states that although it is technically true that "anyone with a computer and Internet connection could access any file on Hotfile," Hotfile provided no index or search feature, which meant that anyone trying to access a file on the Hotfile Website must have known its exact location or URL.

25.     Hotfile admits that it did not have a search feature built into the Hotfile Website system.  Hotfile admits that certain third-party websites indexed or aggregated files on the Hotfile Website.  Hotfile denies the remaining allegations of this paragraph.

26.     Hotfile admits that the files on the Hotfile Website were available to anyone on the Internet as long as such person knew such file's exact URL.  Hotfile denies the remaining allegations of this paragraph.

27. Hotfile admits that anyone who knew the exact URL for a file could download that file. Hotfile admits that it sold "Premium" subscriptions that granted users faster download speeds, fewer download restrictions and longer storage times for files they uploaded. Hotfile admits that "Premium" subscriptions were available for nine dollars per month. Hotfile admits that these subscriptions were Hotfile only source of substantial revenue. Hotfile denies the remaining allegations of this paragraph.

28. Hotfile admits only that it had an affiliate program through which it compensated some users for posting some files. Hotfile denies the remaining allegations of this paragraph.

29. Hotfile denies the allegations of this paragraph.

30. Hotfile admits only that it paid some affiliate sites on some Premium subscriptions sold by Hotfile. Hotfile denies the remaining allegations of this paragraph.

31. Hotfile states that the referenced ruling speaks for itself and no answer to the allegations contained in this paragraph is required. To the extent a response is deemed necessary, Hotfile denies the allegations of this paragraph. In answering further, Hotfile states that the referenced ruling applies only to Hotfile's alleged conduct prior to the filing of the complaint in that action on February 8, 2011.

32. Hotfile denies the allegations of this paragraph.

33. Hotfile states that the reference ruling speaks for itself and no answer to the allegations in this paragraph based on that ruling is required. To the extent a response is deemed necessary to those allegations, Hotfile denies those allegations. In answering further, Hotfile states that the referenced ruling applies only to Hotfile's alleged conduct prior to the filing of the complaint in that action on February 8, 2011. Hotfile denies the remaining allegations of this paragraph.

34. Hotfile denies the allegations of this paragraph.

35. Hotfile admits that Titov participated in the design of some of the Hotfile Website's software. Hotfile admits that Titov participated in creating parts of the Hotfile Website. Hotfile is without sufficient information to determine whether Titov "created" Lemuria Communications, and therefore denies the same. Hotfile denies the remaining allegations of this paragraph.

36. Hotfile admits only that it paid compensation to Titov. Hotfile denies the remaining allegations of this paragraph.

37. Hotfile states that the referenced ruling speaks for itself and no answer to the allegations contained in this paragraph is required. To the extent a response is deemed necessary, Hotfile denies the allegations of this paragraph. In answering further, Hotfile states that the referenced ruling applies only to Hotfile's alleged conduct prior to the filing of the complaint in that action on February 8, 2011.

## CLAIM FOR RELIEF

## VICARIOUS INFRINGEMENT OF COPYRIGHT

38. Hotfile repeats and incorporates by reference each and every one of the foregoing responses to the allegations as if set forth at length herein.

39. Hotfile is without sufficient information or knowledge to admit or deny the allegations of this paragraph and therefore denies the same.

40. Hotfile is without sufficient information or knowledge to admit or deny the allegations of this paragraph and therefore denies the same.

41. Hotfile denies the allegations of this paragraph.

42. Hotfile denies the allegations of this paragraph.

43. Hotfile denies the allegations of this paragraph.

44. Hotfile denies the allegations of this paragraph.

45. Hotfile denies the allegations of this paragraph.

46. Hotfile denies the allegations of this paragraph.

47. Hotfile denies the allegations of this paragraph.

48. Hotfile denies the allegations of this paragraph.

## GENERAL DENIAL

Each and every allegation of the Complaint not specifically admitted is hereby denied.

## AFFIRMATIVE DEFENSES

1. The Complaint is barred, in whole or in part, by the statute of limitations.

2. This Court lacks personal jurisdiction over the Defendants.

3. The Complaint fails to state a claim upon which relief can be granted.

4. Plaintiffs are barred from equitable recovery inasmuch as they have unclean hands.

5. Hotfile's actions and omission constitute fair use, and as such, the Complaint must fail.

6. The Complaint is barred, in whole or in part, by lack of scienter.

7. The Complaint is barred, in whole or in part, because any damages to Plaintiffs were not the proximate result of Hotfile's actions or omissions.

8. The Complaint is barred, in whole or in part, because Plaintiffs have suffered no compensable injury.

9. Plaintiffs are not entitled to injunctive relief because they have not established irreparable harm.

10. Plaintiffs cannot recover damages from Hotfile to the extent that damages alleged by Plaintiffs are speculative or uncertain.

11. Plaintiffs cannot recover damages from Hotfile to the extent that Plaintiffs failed to mitigate their alleged damages.

12. The Complaint is barred, in whole or in part, because the alleged infringement, if any, was innocent.

13. The Plaintiffs have failed to comply with the requirements of the Digital Millennium Copyright Act and, as such, the Complaint must fail in whole or in part.

14. Hotfile is entitled to the safe harbor of the Digital Millennium Copyright Act and, as such, the Complaint must fail in whole or in part.

15. The Complaint fails in whole or in part because the alleged infringements were neither the result of the actions of Hotfile, nor within Hotfile's control.

16. Hotfile's actions and omissions were lawful, justified and privileged.

17. The Complaint is barred, in whole or in part, by an express and/or implied license.

Hotfile has not knowingly or intentionally waived any applicable affirmative defenses and reserves the right to assert and rely on such other applicable affirmative defenses as may become available or apparent during discovery proceedings. Hotfile further reserves the right to amend its answer and/or affirmative defenses accordingly and/or to delete affirmative defenses that it determines are not applicable during the court of subsequent discovery.

## HOTFILE DEMANDS A TRIAL BY JURY

## PRAYER FOR RELIEF

**WHEREFORE**, Hotfile prays for the following relief:

1. That Plaintiffs take nothing by way of their Complaint, that the Complaint be dismissed with prejudice and that judgment be rendered in favor of Hotfile;

2. That Hotfile be awarded its costs including reasonable attorneys' fees incurred herein pursuant to 17 U.S.C. § 505, and costs pursuant to 28 U.S.C. § 1920; and

3. For such other and further relief as the Court deems just and proper.

## COUNTERCLAIMS

For its Counterclaims in this matter, Hotfile states as follows:

### FACTS

1. From 2009 through 2013, Hotfile Corp. ("Hotfile") operated a website at Hotfile.com.

2. During that time, Hotfile.com was a popular Internet file-hosting service. It hosted over 90 million digital files for businesses and people around the world in its high-speed, high-capacity data center.

3. Those files included video, audio, software, and virtually every other file type that its users chose to upload, either for their own personal use, for cloud storage, or to share with their friends, family, colleagues, or coworkers.

4. When a user first signed up with Hotfile or uploaded a file he first had to agree to Hotfile's Terms of Service and its Intellectual Property Policy which prohibited copyright infringement.

5. Upon uploading a file, the individual received a private URL link that was known only to that user. The user could keep that link private for his own personal cloud storage (making the location of the file near-impossible to find) or it could share the link with other

persons whom the user had authorized to access their files. Hotfile did not index the files stored at the site, nor did it provide a search function for users to locate such files. In this respect, Hotfile operated much in the same manner in which DropBox, Carbonite, Microsoft's OneDrive, and Google Drive operate even today.

6.  Hotfile did not, in the ordinary course of its business, review the millions of files that its users uploaded to the site. As a file hosting service, Hotfile rarely knew the content of the files its customers were storing.

7.  One of the few ways that Hotfile might learn of the content of a file uploaded by a user was if it received a DMCA takedown notice from a purported rights-holder, asserting that the file contained infringing materials. Even in such instances, however, Hotfile would not know – based solely on the takedown notice – whether the file in question was actually infringing or not. Not infrequently, the uploader of a file would file a counter-notice under the DMCA, asserting a legitimate right to upload the file in question.

8.  On information and belief, the Plaintiffs in this action did not serve Hotfile with any takedown notices at any time concerning any of the works in suit.

9.  When it was operational, Hotfile's revenues came solely from "premium" subscriptions, whereby users paid up to $9 per month for faster downloads, permanent file storage, and other benefits. This fixed fee did not vary based on what or how much the premium user was using the service. For the same amount, premium users could be using Hotfile for personal cloud storage, downloading open source software, or any other storage use. As such, Hotfile did not derive any direct benefit from allegedly infringing activity.

10. From its inception, Hotfile had in place policies, practices, and safeguards to discourage the use of its service in ways that would infringe on the rights of copyright holders. It

always expressly prohibited infringement and implemented a rigorous notice-and-takedown regime. It also implemented "take down, stay down" technology based on digital fingerprinting and strengthened its repeat copyright infringer termination policy over time in light of its increasing popularity.

11. Hotfile's original February 2009 Terms of Service expressly forbade copyright infringement:

> **Ownership of information and copyrights…**Services of Hotfile can be used in legitimate objectives. Transmission, distribution, or storage of any materials that violate laws is forbidden. This includes without restriction patented materials, copyright laws, trademarks, commercial secrets and other intellectual property rights.…

12. Hotfile also informed repeat infringers that they were subject to termination

13. The first version of Hotfile's website had a "report abuse" form for providing notice of suspected infringing links. Users would input an allegedly infringing URL into this form. This generated a message to Hotfile's abuse department. In response Hotfile took down the links. On information and belief, none of the Plaintiffs ever utilized this tool on the Hotfile website.

14. In April 2009, within months of its launch, Hotfile expanded the policy statement on its website to state, "Hotfile (www.hotfile.com) is an Online Service Provider under Title II of the Digital Millennium Copyright Act, 17 U.S.C. Section 512 …" (*Id*.) That policy identified Hotfile's designated agent for DMCA notices by the abuse@hotfile.com email address:

> To exercise your DMCA rights, your Proper DMCA Notice must be sent to Designated Agent of hotfile.com to email: abuse@hotfile.com. . . When a Proper DMCA notification is received by Designated Agent, or when hotfile.com becomes otherwise aware that copyright rights are infringed, it will remove or disable access to infringing materials as soon as possible.

15. Hotfile continuously made the abuse@hotfile.com email address available on its website since its outset until it ceased operations in 2013.

16. In December 2009, Hotfile registered Constantin Luchian as its designated DMCA agent and provided the abuse@hotfile.com address to the Copyright Office. In April or May of 2010, Hotfile posted Mr. Luchian's name to the Hotfile website.

17. Content owners (other than the Plaintiffs) consistently utilized Hotfile's notice-and-takedown processes and Hotfile expeditiously responded to takedown notices. In general, Hotfile took down files within 48 hours of receiving a DMCA takedown notice.

18. In late April 2009, in response to requests from certain content owners, Hotfile also created a Special Rightsholders Account ("SRA") tool, which enabled high volume content owners the ability to directly take down infringing files without the need to submit a request to Hotfile. The tool also instructed Hotfile's servers to block the re-uploading of the same file to Hotfile's servers. This tool was made available to rightsholders on request. By 2012, more than 100 SRAs were in active use. None of the Plaintiffs ever requested access to the SRA tool.

19. Soon after creating the SRA tool, Hotfile also implemented MD-5 hashtag fingerprinting technology. This technology ensured that, once a file was deleted (either by the SRA tool or DMCA takedown notice), all identical copies were also removed from the system. In addition to deleting duplicate copies of the file, the same file was prevented from being uploaded again by the same user or others, even under a different name.

20. On February 18, 2011, Hotfile strengthened its already exiting repeat infringer policy by instituting a "three-strikes" policy. Under that policy, Hotfile tracked how many times it received notices of claimed infringement for all users (both by DMCA and SRA). Once a user received three such notices their account was permanently terminated and their email address was blacklisted. From February 18, 2011, forward, Hotfile terminated thousands of users pursuant to this strengthened repeat infringer policy.

21. With the implementation of this strengthened repeat infringer policy, Hotfile was fully compliant with all of the prerequisites to qualify it for safe harbor immunity under the DMCA.

22. From February 18, 2011 through the time that it ceased operations, Hotfile continued to implement ever-stronger protections against the upload of infringing materials.

23. In February of 2011, five movie studios, Disney Enterprises, Inc., Twentieth Century Fox Film Corporation, Universal City Studios Productions LLLP, Columbia Pictures Industries, Inc., and Warner Brothers Entertainment, Inc. (collectively, the "Disney Plaintiffs") brought an action in this Court against Hotfile Corporation and Mr. Titov (the "Disney Litigation").

24. In October of 2011, the Disney Plaintiffs first disclosed that they had retained Attorney Scott Zebrak to serve as an expert witness in the Disney Litigation. On information and belief, Attorney Zebrak was retained by the Disney Plaintiffs to serve as an expert witness well before October of 2011.

25. As one of the Disney Plaintiffs' expert witnesses, Attorney Zebrak was given access to information that was designated as Highly Confidential. Indeed some of the information that was designated as Highly Confidential in the Disney Litigation is of such a sensitive nature that the Disney Plaintiffs have, just this month, asked this Court to keep it under seal for years to come.

26. Attorney Zebrak is a founding partner of the law firm Oppenheim & Zebrak, counsel for the Plaintiffs in the present case.

27. Attorneys Zebrak, Oppenheim, and Mustico have represented one or more of the Plaintiffs named in the present action since at least 1998. For example:

- Attorneys Zebrak, Oppenheim, and Mustico represented Plaintiff John Wiley and Sons, Inc. in an action filed in 2008 in the Southern District of New York, captioned *John Wiley & Sons, Inc. v. Supap Kirtsaeng et al.*, Civil Action No. 08-cv-07834-DCP.

- Attorneys Zebrak and Oppenheim represented Plaintiffs Pearson Education, Inc., John Wiley & Sons, Cenage Learning, Inc., and McGraw-Hill Global Education Holdings, LLC in an action filed in 2008 in the Southern District of New York, captioned *Pearson Education, Inc. et al v. Henry Nugroho et al.,* Civil Action No. 08-cv-08034-DAB.

28. Attorney Oppenheim has frequently represented Disney and/or other of the Disney Plaintiffs and has frequently served as co-counsel in such actions with the counsel for the Disney Plaintiffs in the Disney Action.

29. On information and belief, by 2009, each of the Plaintiffs was well aware of the existence of the Hotfile.com website and many similar cyberlockers and were further aware that some users of those sites were uploading to those site copies of their works, which the Plaintiffs claim to have been unauthorized.

30. For example, in May of 2009, the *New York Times* reported that Plaintiff John Wiley & Sons, Inc. had three full time employees who did nothing but search the internet (including cyberlockers) for infringing copies of their works. According to John Wiley & Sons' general counsel, who was quoted in that article, the publisher was sending five times the number of takedown notices in 2009 than it had the year before. *See* **Exhibit 1.**

31. By 2009, concerns that unauthorized copies of books might be improperly shared by the users of cyberlockers was well publicized in the mainstream media. *See, e.g.,* **Exhibits 2-4**.

32. Additionally, by the end of 2009 a widely-cited report by Attributor, a company which provided services to rightsholders to help them identify unauthorized copies of their works on the internet discussed in detail the problems of electronic books being uploaded to cyberlockers, including Hotfile. *See* **Exhibit 5.** At least one of the Plaintiffs, John Wiley & Sons, was a subscriber to Attributor's services.

33. On information and belief, by 2009, each of the Plaintiffs had employees, contractors, or agents whose job duties included searching the internet to locate allegedly infringing copies of their works.

34. According to the Plaintiffs' own complaint, it was not at all difficult for the Plaintiffs to identify allegedly infringing materials that had been uploaded to the Hotfile.com website by Hotfile's users, including the works owned by the Plaintiffs themselves. *See* Complaint, ¶25 ("[A]nyone who wanted to find a popular book such as *Windows for Dummies* on Hotfile would simply have to type that title and Hotfile into an Internet search engine such as Google.").

35. Each of the Plaintiffs is an active member of the trade association, the Association of American Publishers (the "APA").

36. The "APA" and its members have long claimed that the users of cyberlockers were misusing those services to upload and share allegedly infringing materials. For example, in 2010, the AAP, on behalf of its members, presented the Department of Commerce with a 21 page report (citing extensively to the Attributor report), detailing their belief that infringement was rampant across cyberlockers. *See* **Exhibit 6.**

## **COUNT I – DECLARATORY JUDGMENT – DMCA SAFE HARBOR**

37.   Hotfile repeats and realleges the allegations of the above-numbered paragraphs as if set forth in full herein.

38.   As of February 18, 2011, at the latest, Hotfile was in full compliance with all of the requirements of the DMCA and, as such, is entitled to safe harbor from claims for copyright infringement.

39.   Hotfile was a 'service provider' as defined by the DMCA.

40.   As of February 18, 2011, at the latest, Hotfile had adopted and reasonably implemented a policy for the termination in appropriate circumstances of users who are repeat infringers.

41.   Hotfile did not interfere with standard technical measures used by copyright owners to identify or protect copyrighted works.

42.   On information and belief, the Plaintiffs did not issue takedown notices to Hotfile for any of the files in suit.  As such, Hotfile lacked both actual and constructive knowledge of the alleged infringement.

43.   When Hotfile learned of allegedly infringing conduct, it acted expeditiously to remove such content.

44.   Hotfile received no direct financial benefit directly attributable to the alleged infringing activity.

45.   Hotfile lacked the right and ability to control the allegedly infringing activity as those terms have been defined under the DMCA and applicable case law.

46.   Hotfile maintained a designated agent to receive notices of claimed infringement.

47. As of February 18, 2011, at the latest, upon receipt of proper notice under the DMCA, Hotfile responded expeditiously to remove or disable access to the material that is alleged to be infringing.

48. An actual controversy exists between the parties as to the applicability of DMCA safe harbor to Hotfile after February 18, 2011.

49. Hotfile has legal rights which will be affected by the adjudication of this controversy.

**COUNT II – DECLARATORY JUDGMENT – STATUTE OF LIMITATIONS**

50. Hotfile repeats and realleges the allegations of the above-numbered paragraphs as if set forth in full herein.

51. The present action was filed by the Plaintiffs on January 17, 2014.

52. The applicable statute of limitations for actions brought under the Copyright Act is three years.

53. According to their Complaint, each of the works in suit were uploaded to Hotfile.com by Hotfile's users prior to February 18, 2011.

54. At a minimum, the Plaintiffs are barred from pursuing damages for works uploaded during any period of time *other than* January 17, 2011 through February 18, 2011.

55. On information and belief, none of the works in suit were uploaded to Hotfile between January 17, 2011 and February 18, 2011.

56. On information and belief, each of the works in suit was uploaded to Hotfile.com by Hotfile's users prior to January 17, 2014.

57. The Plaintiffs either knew or had reason to know that each of the works in suit were uploaded to the Hotfile.com website prior to January 17, 2011.

58. Given the Plaintiffs' knowledge and concerns surrounding the potential for cyberlockers to be used to facilitate copyright infringement, the burdens placed on rightsholders by Congress to actively look for instances of infringement, the purported ease with which such alleged infringement could have been detected by the Plaintiffs, and their failure to utilize the DMCA takedown notice procedure in connection with the works in suit, the Plaintiffs have unreasonably delayed the bringing of the present action.

59. Although the Eleventh Circuit has not yet decided if it will follow the majority or minority line of cases concerning when an action for copyright infringement accrues, under either test the Plaintiffs are barred in their entirety from pursuing damages for any of the works in suit.

60. An actual controversy exists between the parties as to the applicability of the statute of limitations to the Plaintiffs' claims.

61. Hotfile has legal rights which will be affected by the adjudication of this controversy.

## COUNT III – DECLARATORY JUDGMENT – LACHES

62. Hotfile repeats and realleges the allegations of the above-numbered paragraphs as if set forth in full herein.

63. Given the Plaintiffs' knowledge and concerns surrounding the potential for cyberlockers to be used to facilitate copyright infringement, the burdens placed on rightsholders by Congress to actively look for instances of infringement, the purported ease with which such alleged infringement could have been detected by the Plaintiffs, and their failure to utilize the DMCA takedown notice procedure in connection with the works in suit, the Plaintiffs' claims should be barred by laches.

64. An actual controversy exists between the parties as to the applicability of the doctrine of laches to the Plaintiffs' claims.

65. Hotfile has legal rights which will be affected by the adjudication of this controversy.

**WHEREFORE**, the Defendants pray that:

1. The Court find for the Defendants and against the Plaintiffs on each of the Counts of the Counterclaim;

2. The Court issue a Declaratory Judgment finding that, as of February 18, 2011 at the latest, Hotfile was entitled to safe harbor under the DMCA;

3. The Court issue a Declaratory Judgment finding that the Plaintiffs' claims are barred in their entirety by the statute of limitations;

4. The Court issue a Declaratory Judgment finding that the Plaintiffs' claims are barred in their entirety by the doctrine of laches;

5. The Court award the Defendants their costs and reasonable attorney's fees as a prevailing party under the Copyright Act; and

6. The Court award such further relief to the Defendants as it deems just and necessary.

**HOTFILE DEMANDS A TRIAL BY JURY ON ALL CLAIMS SO TRIABLE.**

**Respectfully submitted:**

/s/ Valentin Gurvits
Valentin D. Gurvits (# 643572 - *pro hac vice*)
Matthew Shayefar (# 685927 - *pro hac vice*)
BOSTON LAW GROUP, PC
825 Beacon Street, Suite 20
Newton Centre, MA  02459
Telephone: (617) 928-1804
Facsimile: (617) 928-1802
vgurvits@bostonlawgroup.com
matt@bostonlawgroup.com

/s/ Brady J. Cobb
Brady J. Cobb, Esquire
Florida Bar No. 031018
COBB EDDY, PLLC
642 Northeast Third Avenue
Fort Lauderdale, Florida 33304
Telephone (954) 527-4111
Facsimile  (954) 900-5507
bcobb@cobbeddy.com

/s/ Evan Fray-Witzer
Evan Fray-Witzer (# 564349 - *pro hac vice*)
CIAMPA FRAY-WITZER, LLP
20 Park Plaza, Suite 505
Boston, MA 02116
Telephone: (617) 426-0000
Facsimile: (617) 507-8043
Evan@CFWLegal.com

*Attorneys for Hotfile*

Dated: January 5, 2015

## CERTIFICATE OF SERVICE

**I hereby certify** that a true and correct copy of the foregoing was served electronically via the CM/ECF electronic filing system on all counsel or parties of record on the attached service list this 5th day of January, 2015.

/s/ Brady J. Cobb
Brady J. Cobb

## SERVICE LIST

Karen L. Stetson
GRAY-ROBINSON, P.A.
1221 Brickell Avenue, Suite 1600
Miami, Florida 33131
Telephone: 305-416-6880
Facsimile: 305-416-6887
karen.stetson@gray-robinson.com

Matthew J. Oppenheim
Kerry M. Mustico
OPPENHEIM + ZEBRAK, LLP
4400 Jenifer Street, NW, Suite 250
Washington, District of Columbia 20015
matt@oandzlaw.com
kerry@oandzlaw.com